UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

A.T.,

                   Plaintiff,

          v.

COMMISSIONER OF SOCIAL
SECURITY,

                   Defendant.

Case No.  25-cv-00638-LJC

**ORDER RESOLVING SOCIAL
SECURITY DISABILITY ACTION**

## I.    INTRODUCTION

Plaintiff A.T.[1] brings this action challenging the decision of Defendant the Commissioner of Social Security (the Commissioner)[2] denying A.T.'s application for disability benefits.  The parties have consented to the jurisdiction of a magistrate judge for all purposes under 28 U.S.C. § 636(c) and filed briefs on the merits in accordance with the Federal Rules of Civil Procedure's Supplemental Rules for Social Security Actions Under 42 U.S.C. § 405(g).

For the reasons discussed below, the Court finds in favor of A.T., except to the extent that she requests a judicial award of benefits rather than further administrative proceedings.  The Commissioner's decision is REVERSED, and the matter is REMANDED for further administrative proceedings consistent with the Order.

---

[1] Because opinions by the Court are more widely available than other filings, and this Order contains potentially sensitive medical information, this Order refers to the plaintiff only by her initials.  This Order does not alter the degree of public access to other filings in this action provided by Rule 5.2(c) of the Federal Rules of Civil Procedure and Civil Local Rule 5-1(c)(5)(B)(i).

[2] Commissioner Frank Bisignano assumed that role while this case was pending, and is therefore automatically substituted as the defendant in this case under Rule 25(d) of the Federal Rules of Civil Procedure.

## II.    BACKGROUND

### A.    Administrative Record

Because the parties' arguments are limited to A.T.'s mental impairments, this summary does not address evidence of physical impairments.  Further, because the administrative law judge (ALJ) who found that A.T. was not disabled focused on the period from A.T.'s alleged onset date in May of 2015 through her date last insured of December 31, 2017, this Order primarily addresses records from that period, as well as certain other evidence addressed by the parties and the ALJ.  Even beyond those limitations, this summary is intended for the convenience of the reader and is not a complete statement of the administrative record or of all relevant evidence that the Court has considered.  The Court has considered all portions of the record addressed by the parties and the ALJ.

A.T. previously received disability benefits from 2001 to 2008 due to "a series of manic episodes, every six months" around 1999 or 2000, before she successfully returned to work in 2008.  Administrative Record (AR, ECF No. 6) at 379, 406, 414.  This action concerns a subsequent application that she filed in 2022, alleging disability beginning in 2015.  *See id.* at 567.

A.T. received a master's degree in social welfare in 2006 or 2008 and obtained a provisional license, but has never passed the law and ethics test necessary to obtain a full license as a social worker.  AR at 324–25.  She was a case worker for the County of Los Angeles in 2008 and 2009.  *Id.* at 332–34.  She moved to New York with her husband and worked as a child and adolescent therapist there from 2011 to 2015.  *Id.* at 335.

A.T. testified that she was able to do that work because she was taking Adderall, which the psychiatrist she has seen since then, Dr. Robert Dolgoff, has been unwilling to prescribe because he believes it increases the risk of manic episodes.  *Id.* at 338–39.  According to A.T., the lack of Adderall and other medication that she wanted "left [her] in a perpetual state of chronic disorganization, and also anxiety, and also depression."  *Id.* at 346.  She cried during the administrative hearing while discussing Dr. Dolgoff's reluctance to prescribe Adderall and antidepressants.  *See id.* at 348.

A.T. and her husband moved to the Bay Area in 2015 to be closer to her husband's family.

2

AR at 339–40.  She was referred by another medical provider for a psychiatric evaluation in August of 2015.  *Id.* at 1220.  At her first visit on August 13, 2015, Dr. Dolgoff noted that A.T. had been diagnosed with bipolar I disorder, was taking various psychoactive medications including Adderall, and had previously been hospitalized three times from 2000 through 2002.  *Id.* Dr. Dolgoff observed "Rapid/Pressured" speech and anxious mood, but also observed adequate or normal dress, grooming, behavior, and thought content.  *Id.*  A.T. indicated that she was (in Dr. Dolgoff's words) "currently doing all right," "adjusting pretty well" to a recent move from New York to California, and caring for her husband while he recovered from a muscle injury.  *Id.*

At a follow-up appointment on August 20, 2015, Dr. Dolgoff reported that A.T.'s speech was mildly pressured but within normal limits, and assessed other aspects of her mental status examination as normal, including that her attention and concentration was "Intact able to stay on topic."  AR at 1224–25.  He noted that she had a "[v]ery difficult husband who is [a] narcissistic and abusive dry drunk," and that she "[w]ould like to get out of the marriage but that will be hard."  *Id.* at 1224.  Dr. Dolgoff characterized A.T.'s recent move as a source of stress.  *Id.*  He noted that she "definitely has ADHD," in a section that might be derived from a call with her previous psychiatrist in New York.  *Id.*  Dr. Dolgoff's notes from an August 27, 2015 appointment are substantially similar.  *See id.* at 1226–27.

A.T. was scheduled to return to Dr. Dolgoff one week later, *see* AR at 1228, but the absence of notes from such a visit in the record suggests that she did not.  On September 10, 2015, she was involuntarily hospitalized after she called 911 and stated that her "husband [was] trying to kill her and her children," reportedly based on delusions.  *Id.* at 716.  Dr. Stephen Allison determined that she "require[d] locked inp[atient] psychiatric hospitalization."  *Id.*  She tested positive for amphetamine, reportedly based on her use of Adderall.  *Id.*  Dr. Allison characterized A.T. as "gravely disabled."  *Id.* at 717.  A.T.'s husband told her treatment providers that she had a history "of going into large debt $150k plus, numerous car accidents, [and] hoards."  *Id.* at 906. He said she was "high functioning with structure," like when she was pursuing her master's degree, but "[w]ith recent move, more stress and less sleep [she] became psychotic and manic, going to fire dept, CHP telling them husband his abusive and raping her and kids."  *Id.*  A.T. later

3

testified at the administrative hearing that her manic episode was caused by stress related to the move and abuse by her husband, who "wouldn't pack a single box, and wouldn't even take a day off for [their] cross-country move." *Id.* at 341.

Dr. Dolgoff's notes from a visit on September 22, 2015 report that A.T. was involuntarily hospitalized for a week due to a manic episode, and discharged September 18, 2025. AR at 1229–30. Her marriage appears to have effectively ended at that time. She had moved out of the family home where her husband and children were living. *Id.* at 1229. Her "[h]usband filed charges against her for domestic violence." *Id.* She was staying in a short-term rental with her mother, who had traveled from the east coast, and had retained a lawyer and forensic psychologist to assist with "legal issues re custody." *Id.* Dr. Dolgoff's mental status examination indicated that A.T.'s speech was mildly pressured, her mood and affect were anxious and fearful, and she was off by one day in identifying the date, but that she otherwise presented as normal, including intact attention and concentration. *Id.* at 1230. Dr. Dolgoff's notes from an October 2, 2015 visit are substantially similar, and indicate that A.T. reported "her mood [was] okay considering that she ha[d]n't been able to see [her] children at all for weeks." *Id.* at 1232–34.

On October 9, 2015, A.T. was "feeling okay." AR at 1236. She was "[w]orking on legal issues" including mediation and meetings with her attorney, and had not yet started a volunteer job at a homeless shelter. *Id.* She was able to see her children "nearly daily" with a babysitter also present. *Id.* Dr. Dolgoff's mental status examination reported generally normal findings except for an anxious mood and affect, and continued to report intact concentration. *Id.* at 1237. A.T. "now ha[d] friends here who are supportive." *Id.* at 1238. Dr. Dolgoff indicated that A.T. would return in two weeks, *id.* at 1238, but the record does not include notes from that session.

Dr. Dolgoff's next treatment note in the record is from February 26, 2016. AR at 1239. That document notes a previous visit on January 22, 2016, which suggests that the record is not complete. *Id.* A.T. reported that mediation was "going nowhere," and that she was frustrated but "managing her feelings." *Id.* Dr. Dolgoff reported a normal mental status examination except for occasional anxiety. *Id.* Notes from A.T.'s next visit on April 5, 2016 are substantially similar, and also indicate that she had a new attorney. *Id.* at 1240.

United States District Court
Northern District of California

On May 6, 2016, Dr. Dolgoff noted that A.T. was tearful and experiencing "increased anxiety close to panic," and that her anxiety was "not this bad in the past." AR at 1241. She and her husband had agreed to divorce, and she was stressed by experiences related to the divorce like having "to wait in [the] front yard for the children" and her husband taking money he shouldn't have out of supports checks. *Id.* She was tearful in her discussion with Dr. Dolgoff. *Id.* In a section labeled "Target Symptoms," Dr. Dolgoff noted that A.T.'s mood was "anxious and sad," though he separately listed her anxiety as "situational only." *Id.* Notwithstanding A.T.'s report of worsening anxiety and her tearfulness in their discussion, Dr. Dolgoff reported a mental status examination identical to the previous two month, again indicating that her mood was "generally okay, sometimes anxious, not depressed," and with no mention of her tearfulness. *Id.*

On May 17, 2016, Dr. Dolgoff noted that A.T. was "anxious and depressed." AR at 1243. She asked for an antidepressant, and Dr. Dolgoff noted a question as to the dosage of Ativan (a brand name of lorazepam) that she had taken in the past. *Id.* A sidebar section labeled "Problems" (previously "Target Symptoms") again listed A.T.'s mood as "anxious and sad," but her anxiety as "situational only." *Id.* Despite acknowledging A.T.'s depression in an earlier section of this treatment note, Dr. Dolgoff repeated identical mental status examination results from the previous months, including that A.T was "generally okay, sometimes anxious, not depressed." *Id.*; *see id.* at 1241, 1240, 1239. Dr. Dolgoff discussed with A.T. that some of the antidepressants she was considering could cause mania or cognitive impairment. *Id.* at 1243.

Dr. Dolgoff reported on June 27, 2016 that A.T. was feeling better, and that her "new meds [were] very helpful for anxiety and depression." AR at 1244. A.T. was now taking Viibryd, which Dr. Dolgoff had previously cautioned could cause mania, among other side effects, and Ativan, which Dr. Dolgoff had cautioned could cause cognitive impairment. *Id.*; *see id.* at 1243. Dr. Dolgoff "warned [her] again about addiction, tolerance, impairment of thinking, [and] falling." *Id.* at 1244. A.T.'s divorce was on hold and her relationship with her husband was "less tumultuous." *Id.* In the "Problems" sidebar, Dr. Dolgoff listed A.T.'s depression as "significantly better." *Id.* Dr. Dolgoff's mental status examination report was once again identical to the previous few months. *Id.*

On August 4, 2016, Dr. Dolgoff reported that A.T. was experiencing "[s]erious difficulty with [her] husband," including disputes over her husband's calls with their children. AR at 1245. A.T. was now dating. *Id.* Her mother had moved to the area and was supportive. *Id.* Dr. Dolgoff warned her again about potential side effects of Ativan, and again repeated the same mental status examination report as in previous months. *Id.* The "Problems" sidebar for this visit was also generally similar to the previous month. *Id.*

On September 8, 2016, Dr. Dolgoff reported that A.T. was still having difficulty with her husband, but she was "happy with meds" and "both anxiety and depression [were] much better." AR at 1247. The mental status examination report remained identical to the previous month, and the "Problems" section characterized her depression as "not sad." *Id.*

On October 12, 2016, Dr. Dolgoff noted that A.T. was "frustrated with the divorce procedures," and again reported identical mental status examination results. AR at 1248. In the "Problems" sidebar, he characterized the status of her depression as "not sad 'all things considered'" and otherwise repeated the same findings as the previous few months. Notes from a November 17, 2016 visit were substantially similar, again repeated the same mental status examination results, and indicated that A.T. was "seeing [a] boyfriend again" who was a "commitment phobe" but might meet her children. *Id.* at 1249.

The next note from Dr. Dolgoff in the record is from January 10, 2017. AR at 1250. He added a new item to the "Problems" list indicating that A.T.'s concentration was impaired and she had "trouble focusing," and also listed the status of her depression as "sad" and her anxiety as "significant impairing function." *Id.* A.T. was upset about the divorce process and felt that her husband was pressuring her to work, which she did not think she was able to. *Id.* Dr. Dolgoff noted that she was "working as a homemaker ½ time." *Id.* Dr. Dolgoff updated the mental status examination results for the first time in many months, reporting that A.T.'s affect was "anxious, appropriate" and that her mood was "anxious, depressed." *Id.*

On February 15, 2017, A.T. told Dr. Dolgoff that her life was "going 'okay.'" AR at 1251. Her romantic relationship with her boyfriend was good but her "divorce situation [was] very stressful." *Id.* The "Problems" and mental status report sections remained the same as the

6

United States District Court
Northern District of California

previous month, noting anxiety, depression, and difficulty concentrating.  *Id.*  Dr. Dolgoff's March 2, 2017 notes were substantially similar, but added to the mental status examination that A.T. was "tearful talking about sadness."  *Id.* at 1252.  His April 13, 2017 notes were similar to the March notes except for discussion of a recent respiratory infection, *id.* at 1253.

On May 18, 2017, Dr. Dolgoff discussed a call he had received from A.T.'s husband:

> Message received from pt's husband telling me pt was angry and yelling. His message said no need to call back but he wanted to report this. I played message for pt ' Pt says she does give me permission to communicate with him. Pt talks about incident - there was a disagreement re time with children. Pt says that whenever there is a disagreement he accuses her of being manic. Discussed mood. Mood mid-range and appropriate now. Also pt does report some success in compromising re disagreements re parenting schedule.

AR at 1254.  Dr. Dolgoff's mental status examination and "Problems" sidebar remained similar to the previous months, indicating depression, anxiety, difficulty concentrating, and that she was "tearful at times."  *Id.*

On August 1, 2017, Dr. Dolgoff noted both positive and negative developments in A.T.'s life.  AR at 1256.  On one hand, she was "[d]oing well – had an entire week with children on vacation, a little let down after return."  *Id.*  On the other hand, she was experiencing "[s]adness re breakup of relationship – boyfriend called it off.  Somewhat more depressed after this but spending time with people."  *Id.*  She was also worried that her husband would not share information about insurance from a new job he had started, potentially affecting her coverage.  *Id.*  The mental status examination and "Problems" sidebar were substantially identical to the previous month, still indicating depression, anxiety "significantly impairing function," and impaired concentration.  *Id.*  Dr. Dolgoff's notes regarding psychotherapy indicated that A.T. was experiencing "[i]rrational exaggerated negative thoughts about [her]self," which he characterized as "cognitive distortions."  *Id.*

Dr. Dolgoff's mental status examination notes for an October 3, 2017 appointment no longer described A.T. as tearful, but were otherwise identical to previous visits, including findings of anxiety and depression.  AR at 1257.  The "Problems" sidebar remained substantially identical, still noting depression, difficulty concentrating, and anxiety "significant[ly] impairing function."

United States District Court
Northern District of California

*Id.*

On October 5, 2017, A.T.'s mother called Dr. Dolgoff to discuss her concern that A.T. "can get very psychotic quickly." AR at 1258. A.T.'s mother stated that A.T. does well on antipsychotic medication. *Id.* A.T. had apparently recently discontinued the Geodon, an antipsychotic, in an attempt to mitigate involuntary movement of her tongue. *See id.* at 1257 (noting on October 3, 2017, as with previous visits, a 60 mg dose of Geodon in A.T.'s medication regimen); *id.* at 1259 ("No change in abn invol movements of tongue despite discontinuation of Geodon[.] No pscyh changes at all[.]"). Dr. Dolgoff's treatment notes consistently described A.T. as not psychotic. *See, e.g.*, *id.* at 1257, 1259 ("Psychosis – none").

At an October 17, 2017 appointment, Dr. Dolgoff proposed meeting with A.T.'s mother, but A.T. declined. AR at 1259. Dr. Dolgoff noted that A.T. had previously been on the antipsychotic medications Zyprexa and Seroquel. *Id.* His psychotherapy summary noted "[i]mportant work on getting licensed as LCSW [i.e., Licensed Clinical Social Worker] in California." *Id.* The mental status examination and "Problems" sections remained substantially identical to the previous visit. *Id.*

Dr. Dolgoff's notes from November 11, 2017 indicate that A.T. was frustrated with her husband canceling meetings and sad after a boyfriend broke up with her. AR at 1260. She described the boyfriend as "a narcissist" (a description she had previously used for her husband) who "was using her . . . to work on his boat." *Id.* The mental status examination results for this visit list A.T.'s mood as "some anxiety depressed re love rel[ationship]," *id.*, as compared to simply "anxious, depressed" for previous visits, *see, e.g.*, *id.* at 1259. The remainder of the mental status examination, and the entirety of the "Problems" sidebar, remained substantially identical. *Id.* at 1260. Notes from November 17, 2017 were generally the same. *Id.* at 1261.

A.T.'s mother left Dr. Dolgoff a message on December 7, 2017, which Dr. Dolgoff summarized as follows:

> Edgy, irritable, feels like a victim, repeats self. Not much insight
> Old themes repeated not untrue.
> Not manic

AR at 1263. Dr. Dolgoff later characterized that message as reporting that A.T. was "worse since

being off Geodon." *Id.* at 1262.

Dr. Dolgoff's notes from a December 8, 2017 visit indicated some improvement in the "Problems" sidebar, characterizing A.T.'s depression as "pt says not sad," and her anxiety as "some" (as opposed to significant impairment noted previously). AR at 1262. He continued to note impaired concentration. *Id.* The mental status examination remained identical to previous visits. *Id.*

On January 3, 2018, Dr. Dolgoff characterized A.T.'s depression as "mild," and otherwise presented findings similar to those of previous visits in the "Problems" sidebar and mental status examination. AR at 1264. A.T. was "[w]orking on getting LCSW – much to do. Admin work, on line classes etc." *Id.* Dr. Dolgoff discussed the potential for future medication if A.T. was emotionally unstable (a possibility he had also discussed in previous notes), but noted that she was "at present reasonably stable." *Id.* A.T. continued to see Dr. Dolgoff in the years that followed, but this Order does not address in detail his treatment notes from further beyond her December 31, 2017 date last insured. *See id.* at 1265–1400.[3]

A.T. spent several years studying for the law and ethics test for a social worker's license. She testified at the administrative hearing that she studied "maybe three times a week," "for like a couple of hours." AR at 357–58. A counselor from the Department of Rehabilitation brought her study materials but did not provide active coaching, which A.T. could not afford. *Id.* at 367. She was unable to concentrate and to retain the information that she needed to pass the test. *Id.* at 367–68. She could pass half-hour online self-guided practice tests, but she would take a break after that half hour. *Id.* at 368–69.

A.T. testified that she was hospitalized four times for manic episodes in subsequent years, twice in the summer of 2018 and twice in the summer of 2019. AR at 342. The administrative record includes evidence from at least three such incidents. AR at 714, 770, 864. One of those incidents involved A.T. saying "socially inappropriate" things about Carrie Fisher at an open mic

---

[3] Some of those subsequent treatment notes indicate that Dr. Dolgoff began keeping his psychotherapy notes separately in accordance with a recommendation of the American Psychiatric Association. *See, e.g.*, AR at 1285. The parties have not addressed whether those notes are, or should be, included in the record.

United States District Court
Northern District of California

night at a bar, where she was not on the list to perform and "knew that would make everybody angry." *Id.* at 363; *see id.* at 864 (hospital record indicating A.T. was brought in by police after having "an altercation in the bar," and noting psychosis).  In another incident, she was "brought to the hospital . . . by EMS after she was found yelling at people on the street and was combative with bystanders and the police." *Id.* at 714.  In the third incident, she was "[p]laced on 5150 by San Mateo sheriff as [gravely disabled] after being found in car on side road hysterically crying after getting into altercation with male at a highway fruit stand, making bizarre statements about being on a mission for government agency after uncovering a child trafficking ring." *Id.* at 770.  She had "a vagrant in her car" and accused the fruit stand worker "of racism after goading him with statements about 'Martin Luther King.'" *Id.*  She "worked with [her and her husband's] parent coordinator" after those incidents "to get [her] kids back in a few months." *Id.* at 349.  Since the last of those episodes, her doctor added lithium to her medication regimen. *Id.* at 342.

A.T. has not worked for pay since her alleged onset date.  The record includes some references to volunteer work, but she testified she only bought meals for people who were unhoused in Berkeley and "talk[ed]" to them for a couple of minutes," that she was doing that herself rather than through any kind of organization, and that it lasted "a couple of months" because she was paying for the meals herself and could not afford it.  AR at 360–61.  She also volunteered for "maybe a couple of weeks" washing dishes at "a Catholic program in mid-downtown Berkeley." *Id.* at 362–63.  At the administrative hearing, the ALJ asked about Dr. Dolgoff's reference to her working on a boyfriend's boat, but she said she only did that a few times, doing things like holding parts for him while he made repairs. *Id.* at 359–60.

A.T.'s custody relationship with her children has been challenging.  Around 2021,[4] her daughter (then twelve years old) complained to her therapist about A.T.'s emotional struggles, dirty dishes, and cluttered house, and A.T. lost custody of her.  AR at 348.  A.T.'s relationship with her son, who is fifteen months younger than her daughter, has been better, but she "lost some custody with him because of the situation with" her daughter. *Id.*  As of the 2023 administrative

---

[4] At the time of the administrative hearing in 2023, A.T.'s daughter was fourteen years old.  A.T. described these events as occurring when her daughter was twelve.  AR at 348.

United States District Court
Northern District of California

hearing, she had 30% custody of her son such that he stayed with her every other weekend. *Id.* at 349, 365.

In a 2022 function report for her disability application, A.T. noted difficulty sleeping, "mood swings[,] and executive functioning/organizational challenges re [activities of daily living] and developing successful systems for paying bills." AR at 610. She reported that she prepared her son's lunch and transported him to school and activities when he was in her care, but otherwise did little besides nap, "try to do a little reading," and "participate in therapy + psychiatry sessions," *id.* at 611, as well as watching television, drawing, and talking with friends on the phone or by text message, *id.* at 614. She prepared meals four or five times a week and otherwise orders food. *Id.* at 612. She did not identify restrictions in her ability to dress or feed herself, but stated that she "often ha[d] difficulty bathing routinely." *Id.* at 611. Her mother assisted her with reminders to take her medication and manage personal needs and grooming, and with household chores like cleaning. *Id.* at 612. A.T. reported that she only did light cleaning every one or two weeks and that it took her a long time. *Id.* She reported only leaving the house once or twice a week due to COVID-19 and because she "feel[s] more comfortable at home. *Id.* at 613. A.T. stated that she has spent money irresponsibly during manic episodes. *Id.* She checked a box indicating that she has "problems getting along with family, friends, neighbors, or others" but did not provide an explanation. *Id.* at 614. She reported that she does not always finish what she starts because she loses focus, and in response to a question asking how long she can pay attention, she wrote: "It depends – maybe 15 min?" *Id.* at 615. She had difficulty with memory, following instructions, and completing tasks. *Id.* A.T. reported that her responsibilities as a "part-time single mom" often left her feeling like she was "drowning in the tasks [she] ha[d] to complete and . . . stretched paper thin." *Id.* at 617.

A.T.'s mother also completed a function report in which she corroborated A.T.'s reports of needing her mother's assistance, including several hours a week helping with basic tasks and reminders to bathe and wash her clothes. AR at 621–28. According to A.T.'s mother, A.T. went outside "very rarely, only when necessary," and "parking can overwhelm her." *Id.* 624. A.T.'s mother said that she shops for food every two weeks but that "takes her hours more than most

11

United States District Court
Northern District of California

people." *Id.* A.T.'s mother reported that family helped her with around $200,000 of credit card debt due to irresponsible spending. *Id.* at 625. Her mother reported that A.T. could pay attention for "maybe 15 min[utes] max," and that although she did not at that time have difficulty getting along with people, she would "get[] in verbal altercations with people in the neighborhood and elsewhere" when manic. *Id.* at 626. Addressing A.T.'s difficulty following through with tasks, her mother noted that she was supposed to complete a medical screening procedure two years ago, but she continued to respond "it's on the list" when her mother asked about it. *Id.* at 628.

In May of 2023, Dr. Dolgoff completed a Mental Impairment Questionnaire assessing A.T.'s symptoms and limitations. AR at 1341–48. He identified a large number of symptoms, including (to name only a few) "Impairment in impulse control," "Difficulty thinking or concentrating," "Bipolar syndrome with episodic periods manifested by the full symptomatic picture of both manic and depressive syndromes," and "Memory impairment." *Id.* at 1342. In the category of understanding, remembering, or applying information, Dr. Dolgoff assessed minimal limitations for some abilities and moderate limitations for others. *Id.* at 1343. In the category of interacting with others, he assessed marked limitations in A.T.'s ability to cooperate and handle conflict, understand and respond to social cues, and respond appropriately to supervisors and coworkers, and less severe limitations with respect to other activities. *Id.* at 1343–44. Dr. Dolgoff assessed extreme limitations in five of the nine abilities listed in the category of concentration, persistence, or maintaining pace, including A.T.'s abilities to stay on task, maintain attention for a two-hour period, and "[c]omplete a normal workday and workweek without interference from psychologically based symptoms." *Id.* at 1344. He assessed marked limitations in two of the remaining four abilities in that category. *Id.* Dr. Dolgoff assessed a combination of moderate and marked limitations for most abilities in the category of adapting or managing oneself, as well as an extreme limitation in "[r]espond[ing] to demands." *Id.* at 1345. He reported extreme limitations in all components of the mental abilities to do semiskilled and skilled work. *Id.* Dr. Dolgoff did not think that A.T. would be able to work at all, and reported that she would be able to maintain attention and concentration for less than seventy-five percent of a typical workday. *Id.* at 1346.

On October 7, 2023, Dr. Dolgoff submitted a short letter stating that repeated references in

some medical records to "Bipolar Disorder in Full Remission" were the result of a technical error that he had overlooked. AR at 1401. He asserted that "[r]eview of the actual notes shows that she has generally not been [sic] remission, she has been symptomatic for the duration of her care." *Id.* Dr. Dolgoff opined that "that Ms. Trush has suffered from marked limitations with respect to work virtually continuously throughout the time that I have been her psychiatrist" over the previous eight years. *Id.*

A.T. testified at an October 13, 2023 administrative hearing that she struggles with keeping her home clean and organized, and with tasks like "throwing away food that went bad, not buying too much food, getting the laundry done, getting [herself] showered," which are stressful for her. AR at 349. Her mother helps her with shopping. AR at 349–50. She has trouble concentrating, and she noted as an example a recent incident where she had discussed ordering dinner for delivery with her son, but then she never placed the order and he had to remind her. *Id.* at 350–51.

A.T. testified that she does not "really go out much anymore," but she has friends she calls to talk to when she is stressed. AR at 352. She also prays as a method of managing her stress. *Id.* A.T. stated that she "can't control being sad and flooded and weepy, which is, you know, part of the reason why I'm still sitting here, crying" during the administrative hearing. *Id.* She testified that stress can trigger mania. *Id.*

At the administrative hearing, A.T. did not believe she would be able to work, "based on [her] mood swings, based on [her] sleep problems, based on [her] distractibility and hyperactivity," and based on her social skills and the risk of stress causing mania. AR at 366.

The ALJ presented a vocational expert (VE) with the hypothetical scenario of someone of A.T.'s age, education, and work experience who could work at all exertional levels, but limited to "low-stress work, which is defined as simple, routine tasks that require only occasional interaction with the public, that's either on [the] telephone or in person," and further limited to only occasional interaction with coworkers, no "fast-paced work, such as assembly line work," and no responsibility for the safety of others. AR at 372. The VE testified that such a person could not perform A.T.'s past work, but could work as a cleaner/housekeeper, assembler, or laundry worker. *Id.* at 372–73. In response to a second hypothetical, involving similar restrictions but only

13

"occasional workplace changes," "no interaction with the public except incidental interactions such as giving directions to the nearest restroom or exit, and only occasional interaction with coworkers that does not involve teamwork," the VE gave the same answers. *Id.* at 373–74. The VE also did not believe that being off task for ten percent of the time would change his answers, though more than ten percent might. *Id.* at 375. If such a person was absent from work once per month, however, the VE testified that they would not be able to hold the sort of unskilled jobs at issue. *Id.* at 374–75.

### B.      Five-Step Framework for Disability Determinations

The Social Security Administration uses a five-step process to determine whether claimants are disabled, and thus entitled to disability benefits:

> Step 1. Is the claimant presently working in a substantially gainful activity? If so, then the claimant is "*not disabled*" within the meaning of the Social Security Act and is not entitled to disability insurance benefits. If the claimant is not working in a substantially gainful activity, then the claimant's case cannot be resolved at step one and the evaluation proceeds to step two. *See* 20 C.F.R. § 404.1520(b).

> Step 2. Is the claimant's impairment severe? If not, then the claimant is "*not disabled*" and is not entitled to disability insurance benefits. If the claimant's impairment is severe, then the claimant's case cannot be resolved at step two and the evaluation proceeds to step three. *See* 20 C.F.R. § 404.1520(c).

> Step 3. Does the impairment "meet or equal" one of a list of specific impairments described in the regulations? If so, the claimant is "*disabled*" and therefore entitled to disability insurance benefits. If the claimant's impairment neither meets nor equals one of the impairments listed in the regulations, then the claimant's case cannot be resolved at step three and the evaluation proceeds to step four. *See* 20 C.F.R. § 404.1520(d).

> Step 4. Is the claimant able to do any work that he or she has done in the past? If so, then the claimant is "*not disabled*" and is not entitled to disability insurance benefits. If the claimant cannot do any work he or she did in the past, then the claimant's case cannot be resolved at step four and the evaluation proceeds to the fifth and final step. See 20 C.F.R. § 404.1520(e).

> Step 5. Is the claimant able to do any other work? If not, then the claimant is "*disabled*" and therefore entitled to disability insurance benefits. *See* 20 C.F.R. § 404.1520(f)(1). If the claimant is able to do other work, then the Commissioner must establish that there are a significant number of jobs in the national economy that claimant can do. There are two ways for the Commissioner to meet the burden of showing that there is other work in "significant numbers" in the

14

national economy that claimant can do: (1) by the testimony of a vocational expert, or (2) by reference to the Medical–Vocational Guidelines at 20 C.F.R. pt. 404, subpt. P, app. 2. If the Commissioner meets this burden, the claimant is "*not disabled*" and therefore not entitled to disability insurance benefits. *See* 20 C.F.R. §§ 404.1520(f), 404.1562. If the Commissioner cannot meet this burden, then the claimant is "*disabled*" and therefore entitled to disability benefits. *See id.*

*Tackett v. Apfel*, 180 F.3d 1094, 1098–99 (9th Cir. 1999) (footnote omitted); *see also Maxwell v. Saul*, 971 F.3d 1128, 1130 n.2 (2020).[5]

For Step 3 of the analysis, nearly all listed impairments related to mental health or functioning incorporate a test of whether a claimant has either "extreme" limitations in one category, or "marked" limitations in two categories, with respect to a claimant's abilities to: (1) "Understand, remember, or apply information"; (2) "Interact with others"; (3) "Concentrate, persist, or maintain pace"; and (4) "Adapt or manage oneself." These standards are often referenced as the "Paragraph B criteria." *See* Listing 12.00(A)(2). For some listings, that standard can be substituted by a claimant showing that they meet separate "Paragraph C criteria" or other listing-specific standards. *Id.* The Paragraph C criteria for the impairments at issue require a claimant to show "medically documented history of the existence of the disorder over a period of at least 2 years"; ongoing treatment, therapy, support, or a highly structured setting that diminishes the claimant's symptoms; and "minimal capacity to adapt to changes in [the claimant's] environment or to demands that are not already part of [her] daily life." *See* Listing 12.00(A)(2)(c); Listing 12.04(C).

Before evaluating Steps 4 and 5, the ALJ assesses a claimant's residual functional capacity (RFC), which is "what the individual can still do despite her limitations." *See Mayes v. Massanari*, 276 F.3d 453, 460 (9th Cir. 2001). "At steps one through four, the claimant retains the burden of proof; at step five, the burden shifts to the Commissioner." *Maxwell*, 971 F.3d at 1130 n.2.

---

[5] The regulatory citations in this passage apply to adjudication of Disability Insurance benefits and refer to an earlier version of 20 C.F.R. § 404.1520 that is substantially similar to the current language of that regulation. 20 C.F.R. § 416.920 sets forth materially identical steps to assess disability for the purpose of Supplemental Security Income benefits, which are not at issue in this case.

15

C.    The ALJ's Decision

1.    Steps 1 and 2

At Step 1, the ALJ determined that A.T. had not engaged in substantial gainful activity during the time period at issue.  AR at 26.

At Step 2, the ALJ determined that A.T. had severe impairments of PTSD, ADHD, depression, anxiety, and bipolar 1 disorder.  AR at 26.  The ALJ found several other impairments—primarily physical impairments—to be non-severe.  *Id.*

2.    Step 3

At Step 3, the ALJ determined that those impairments did not meet or medically equal the severity of any impairment listed in the applicable regulations.  AR at 27.  He considered Listings 12.04 (Depressive, bipolar, and related disorders), 12.06 (Anxiety and obsessive-compulsive disorders), 12.11 (Neurodevelopmental disorders), and 12.15 (Trauma- and stressor-related disorders).  AR at 27.  Each of those listings includes the standard Paragraph B criteria and the same alternative paragraph C.  The ALJ focused his analysis on Paragraph B and C criteria, perhaps assuming for the sake of argument that A.T.'s impairments could meet or medically equal one or more of the Paragraph A impairment-specific criteria.  *See id.* at 27–29.

The ALJ found only mild limitations in A.T.'s ability to understand, remember, or apply information, noting testimony that she could follow a simple recipe and medical records (including Dr. Dolgoff's periodic mental status examinations) indicating intact memory.  AR at 27.

The ALJ found only moderate limitations in A.T.'s ability to interact with others.  AR at 28.  He cited the fact that she was never fired from a job for failure to get along with people, as well as her report "that she talks with friends or the phone or text a couple of times a week."  *Id.*  The ALJ asserted that A.T. reported "no problems getting along with family, friends, neighbors, or others," *id.*, even though in the exhibit that he cited, she checked a box indicating the opposite, *id.* at 614.  The ALJ also cited reports in Dr. Dolgoff's treatment notes that A.T. enjoyed spending time with her children and with friends.  *Id.* at 28.  Against that evidence, the ALJ noted A.T.'s

United States District Court
Northern District of California

mother's[6] report that A.T. mostly stayed at home and sometimes got into verbal altercations, and acknowledged that "the totality of the medical evidence demonstrates that the claimant has had difficulty in social and romantic relationships, including being involved in a contention divorce and being the victim of domestic violence." *Id.* On balance, the ALJ found "that a moderate limitation of function exists in this area." *Id.*

The ALJ also found only a moderate limitation in concentrating, persisting, or maintaining pace. AR at 28. He rejected A.T.'s and her mother's reports that she could only concentrate for fifteen minutes at a time, because even though Dr. Dolgoff "consistently acknowledge[d] the claimant's subjective allegations of impaired concentration and difficulty focusing," Dr. Dolgoff also noted "'normal' activity levels, including being able to work on getting her LCSW degree,[7] go on vacation, handle legal issues related to her divorce, spend time raising her children, and be involved in a romantic relationship." *Id.* The ALJ also cited A.T.'s testimony regarding taking half-hour online tests and studying "for a 'couple of hours a few times a week,'" as well as her intact concentration during the one-hour administrative hearing, as undermining her claim of a more-than-moderate limitation. *Id.*

The ALJ determined that A.T. "had experienced a mild limitation" in adapting or managing herself. AR at 28. He noted her reports "that she can dress, shave, and feed herself without difficulty," that she can prepare meals for herself and her son four or five times a week, and that she can shop for groceries and handle money. *Id.* He cited Dr. Dolgoff's notes of A.T.'s "consistent reports of having a 'normal' activity level, including being able to work on getting her LCSW degree, go on vacation, handle legal issues related to her divorce, spend time raising her children, and be involved in a romantic relationship." *Id.* The only limitations that the ALJ acknowledged in A.T.'s ability to adapt and manage herself were receiving "help from her mother caring for her 11-year-old son, especially on the weekends," and "difficulty with keeping her

---

[6] The ALJ erroneously referred to A.T.'s mother using A.T.'s name (which is not also her mother's name), but identified her as "the claimant's mother" and included a citation to A.T.'s mother's function report. *See* AR at 28.
[7] The ALJ here appears to be referring to the social worker's license (rather than a degree) that A.T. never obtained.

17

house clean." *Id.* at 29.

Finding no marked or extreme limitations in the Paragraph B criteria, the ALJ turned to Paragraph C. AR at 29. He accurately recited the requirements for that paragraph for the listings at issue, but found them not satisfied based solely on the following analysis:

> In this case, the claimant is not in a highly structured setting that is designed to, or intended to, diminish the symptoms and signs of her mental disorder. Further, there is no evidence of only marginal adjustment. The medical evidence further establishes that the claimant is able to take care of his [sic] activities of daily living. Therefore, the "C criteria" are not met.

*Id.*

Because the ALJ determined that A.T.'s impairments did not meet or equal a listing, he did not find her disabled at Step 3. AR at 27.

### 3.    Residual Functional Capacity

The ALJ assessed A.T.'s RFC as follows:

> Through the date last insured, the claimant had the residual functional capacity to perform a full range of work at all exertional levels but with the following nonexertional limitations: the claimant can perform low stress work, which is defined as a limitation to work involving simple routine tasks involving simple work-related decisions and occasional workplace changes. The claimant can have no interaction with the public except incidental interaction such as giving direction to the nearest restroom or exit, and only occasional interaction with coworkers that does not involve teamwork. The claimant cannot perform fast-paced work (i.e., assembly line work) and cannot perform work that requires the claimant to be responsible for the safety of others.

AR at 29. That RFC included all of the restrictions that the ALJ presented to the VE except for the alternative scenarios of being off task up to ten percent of the workday and missing one day of work per month. *See id.* at 372–75.

In explaining that finding, the ALJ recited much of A.T.'s hearing testimony. AR at 30. He found that her "medically determinable impairments could reasonably be expected to cause the alleged symptoms, but concluded that her "statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record for the reasons explained in this decision." *Id.* The ALJ found "the claimant's statements about the intensity, persistence, and limiting effects of her symptoms . . .

18

inconsistent because the clinical and objective findings contained in the medical evidence prior to the claimant's date last insured (DLI) of December 31, 2017 are inconsistent with the claimant's allegations of disabling psychological conditions." *Id.*

The ALJ then recited much of A.T.'s treatment history in 2015 through January 3, 2018, including fluctuating reports of symptoms and mental status examinations, as well has involuntary hospitalization. AR at 31–32. The ALJ concluded from that record that "although the claimant's psychological conditions caused symptoms and functional limitations prior to December 31, 2017, it appears that her symptoms only fluctuated between mild and moderate levels of functional impairment." *Id.* at 32. He noted her ability "to work on getting her LCSW degree, go on vacation, handle legal issues related to her divorce, spend time raising her children, and be involved in a romantic relationship." *Id.* He expressed sympathy with her "continuing struggles with her mental health conditions, including her testimony that she experienced multiple manic episodes in the summers of 2018 and 2019," but found "no indication her psychological conditions caused functional limitations at a disabling level prior to her [date last insured] of December 31, 2017." *Id.* Similarly, the ALJ found A.T.'s hearing testimony regarding "symptoms and limitations she currently experiencing" unpersuasive for failure to "specifically address the relevant time period prior to December 31, 2017, and "not generally reflected in the clinical and objective findings" from that period. *Id.*

Addressing medical opinion evidence, the ALJ found opinions of non-examining Disability Determination Services physicians—who reviewed A.T.'s application and found only non-severe psychological impairments—unpersuasive because they lacked access to Dr. Dolgoff's records, "which clearly establish the presence of severe psychological conditions." AR at 32. The ALJ found the opinions of Nicki Koethner, a therapist A.T. saw, only partially persuasive because she provided only vague assessments of functional limitations. *Id.* at 32–33.

The ALJ found Dr. Dolgoff's opinions persuasive to the extent that he identified mild and moderate functional limitations, but unpersuasive to the extent that he identified marked and extreme limitations. AR at 33. He noted that Dr. Dolgoff assessed various extreme limitations related to concentration, including with respect to maintaining concentration for two-hour

19

segments, but that A.T. testified "that she studied for a 'couple of hours a few times a week,'" and Dr. Dolgoff's treatment notes indicated intact concentration and ability to stay on topic. *Id.* The ALJ also noted that Dr. Dolgoff assessed a marked limitation in ability to "[t]ravel to an unfamiliar place," even though he reported that A.T. "was '[d]oing well' after an entire week of vacation." *Id.* (brackets in original; citations omitted).

The ALJ found that Dr. Dolgoff's October 7, 2023 letter was unsupported and inconsistent with the record. AR at 33–34. The ALJ rejected Dr. Dolgoff's statement that A.T. was "symptomatic for the duration of her care" and generally not in remission, because A.T. "was hospitalized due to exacerbation of her condition in 2015, but then not again until the summers of 2018 and 2019 . . . well after her date last insured," and because Dr. Dolgoff's treatment notes sometimes indicated improved mood and anxiety. *Id.* at 34. The ALJ rejected Dr. Dolgoff's conclusion that A.T. "suffered from marked limitations with respect to work virtually continuously" because Dr. Dolgoff "did not define what he meant by 'marked' limitations," and because the ALJ considered that opinion inconsistent with Dr. Dolgoff's previous assessment of "extreme" limitations in some areas. *Id.*

The ALJ found A.T.'s mother's report "useful in helping [the ALJ] to understand the nature of the claimant's alleged impairments and functional deficits," but did not address which portions of that report he found credible in reaching his conclusions regarding A.T.'s RFC. AR at 34.

### 4.    Steps 4 and 5

At Step 4, the ALJ credited the VE's testimony that A.T. could not perform her past work as a case worker or counselor, and thus did not find A.T. non-disabled at that step. AR at 34–35. At Step 5, the ALJ credited the VE's testimony that someone with the RFC that the ALJ assessed could work as a housekeeper,[8] assembler, or laundry worker, and thus found that A.T. was not

---

[8] Though not a specific basis for the Court's decision, the ALJ's conclusion that A.T. could work as a housekeeper is in tension with the ALJ's acknowledgment of her "difficulty with keeping her house clean." AR at 29. That is not to mention—and indeed, the ALJ did not mention—the evidence that A.T. lost even partial custody of her daughter due in large part to her unclean house. *See id.* at 348.

disabled through her date last insured. *Id.* at 35–36.

### D.    The Parties' Arguments

A.T. contends that the ALJ erred in evaluating the Paragraph B and C criteria at Step 3. ECF No. 10 at 16–24.[9] She argues that the ALJ failed to address evidence relevant to her ability to interact with others (including but not limited to her 2015 hospitalization), *id.* at 16–18, relied on irrelevant conduct in addressing her concentration, persistence, and pace, *id.* at 18–20, and erroneously relied on daily activities rather than evidence of emotional regulation in addressing A.T.'s ability to adapt or manage herself. *Id.* at 20–23. With respect to Paragraph C, A.T. contends that the ALJ erred in considering only whether she was in a "highly structured setting" and not alternatives like ongoing "mental health therapy," and in failing to address her involuntary hospitalizations in the context of "marginal adjustment." *Id.* at 23–24.

A.T. also argues that the ALJ failed to provide clear and convincing reasons to discredit her testimony (or even to identify what testimony he rejected), *id.* at 24–26, and that the ALJ's reasons for rejecting Dr. Dolgoff's opinions lacked substantial evidence, *id.* at 26–29. A.T. contends that an award of benefits, rather than further administrative proceedings, is warranted because "[t]here is no serious doubt" that she is disabled. *Id.* at 29.

The Commissioner relies on the highly deferential standard of review for an ALJ's findings. ECF No. 13 at 2–3. He contends that Dr. Dolgoff's mental status examinations included normal findings or only relatively mild limitations, and argued that A.T. does not satisfy any of the Paragraph B criteria because she "was able to navigate a very stressful divorce, maintain housing, regain partial custody of her children, make friends, begin dating, and take her children on a one week vacation." *Id.* at 7. The Commissioner argues that the ALJ properly found that A.T. did not satisfy Paragraph C's test for "marginal adjustment" because she did not experience limitations like inability to function outside her home. *Id.* at 7–8.

The Commissioner contends that the ALJ properly rejected A.T.'s symptom testimony,

---

[9] Except for the administrative record, which this Order cites using the continuous pagination assigned by the Commissioner, this Order cites other documents in the record using the page numbers assigned by the Court's ECF filing system.

because an ALJ may consider the degree to which objective medical evidence supports such testimony as one relevant factor. ECF No. 13 at 9. The Commissioner relies on Dr. Dolgoff's "largely unremarkable mental status examination findings," *id.* at 9–10, and on A.T.'s activities like taking a vacation, pursuing a social worker's license, and "working on legal issues related to her divorce," *id.* at 10–11. As A.T. notes in her reply, ECF No. 14 at 6, one long paragraph in this portion of the Commissioner's brief appears to refer to a different case, with inapplicable references to a male claimant, use of Prozac, a lack of mental health treatment after 2017, and higher page numbers than exist in the administrative record here. ECF No. 13 at 9–10.

The Commissioner also argues that the ALJ properly evaluated and discredited portions of Dr. Dolgoff's medical opinion evidence. ECF No. 13 at 11–13. The Commissioner asks the Court to affirm the ALJ's decision, or if the Court finds any error, to remand for further proceedings rather than require an award of benefits. *Id.* at 14.

A.T. contends in her reply that the Commissioner failed to respond to a number of her arguments, and she asks again the Court award her benefits. *See generally* ECF No. 14.

## III.    LEGAL STANDARD

In cases challenging the denial of disability benefits, district courts have authority to review and "affirm[], modify[], or revers[e] the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g). "An ALJ's disability determination should be upheld unless it contains legal error or is not supported by substantial evidence," which "'means more than a mere scintilla, but less than a preponderance; it is such relevant evidence as a reasonable person might accept as adequate to support a conclusion.'" *Garrison v. Colvin*, 759 F.3d 995, 1009 (9th Cir. 2014) (quoting *Lingenfelter v. Astrue*, 504 F.3d 1028, 1035 (9th Cir. 2007)). A court must consider evidence both supporting and detracting from the Commissioner's decision; if the evidence could reasonably support either outcome, the court may not substitute its judgment for that of the ALJ. *Id.* at 1010. Courts "review only the reasons provided by the ALJ in the disability determination and may not affirm the ALJ on a ground upon which he did not rely." *Id.*

22

IV.    ANALYSIS

As discussed below, at least three categories of errors in the ALJ's decision require reversal and remand: (1) cherry-picked and unsupported use of evidence to support the conclusion of non-disability, while disregarding evidence when it cuts against that conclusion; (2) improper analysis of the Paragraph C criteria for the mental health listings at issue; and (3) failure to provide clear and convincing reasons to reject specific portions of the A.T.'s symptom testimony.  Because those errors are sufficient to require reversal and remand for further proceedings, and other errors would not entitle A.T. to any further relief, the Court does not reach A.T.'s remaining arguments beyond those addressed below.  The Commissioner is encouraged to consider any other arguments that A.T. might raise on remand.

A.    The ALJ Erred in Cherry-Picking and Mischaracterizing Evidence

An ALJ may not "selectively rel[y] on some entries in [a claimant's] records" while "ignor[ing] the many others that indicated continued, severe impairment."  *Holohan v. Massanari*, 246 F.3d 1195, 1207 (9th Cir. 2001).  In other words, an "ALJ may not cherry-pick evidence to support the conclusion that a claimant is not disabled, but must consider the evidence as a whole in making a reasoned disability determination."  *Lilita H. v. Kijakazi*, No. 21-cv-04063-JSC, 2022 WL 4225395, at *3 (N.D. Cal. Sept. 13, 2022) (quoting *Williams v. Colvin*, No. ED CV 14-2146-PLA, 2015 WL 4507174, at *6 (C.D. Cal. July 23, 2015)).  Such "'cherrypicking' . . . has repeatedly been found to fall short of the Commissioner's obligations."  *Bautista v. Saul*, No. 18-cv-07693-JCS, 2020 WL 1478327, at *7 (N.D. Cal. Mar. 26, 2020)); *see also Diedrich v. Berryhill*, 874 F.3d 634, 642 (9th Cir. 2017) ("It was improper for the ALJ to discount Diedrich's testimony by 'cherry pick[ing]' the absence of certain symptoms from this report." (quoting *Attmore v. Colvin*, 827 F.3d 872, 877 (9th Cir. 2016)); *Ghanim v. Colvin*, 763 F.3d 1154, 1164 (9th Cir. 2014) ("[T]he ALJ improperly cherry-picked some of Dr. Dees's characterizations of Ghanim's rapport and demeanor instead of considering these factors in the context of Dr. Dees's diagnoses and observations of impairment.").

Perhaps the most extreme example of cherry-picking here is the ALJ's selective consideration of A.T.'s September 2015 week-long involuntary hospitalization.  The ALJ

United States District Court
Northern District of California

United States District Court
Northern District of California

mentioned that incident exactly three times in his decision. First, the ALJ noted that A.T. was assessed during that hospitalization as having intact memory, and used that assessment to support the ALJ's finding of only mild limitations in understanding, remembering, or applying information. AR at 27. Second, the ALJ noted the 2015 hospitalization in a lengthy recitation of A.T.'s medical history from 2015 through 2017, which ended with the conclusion that "it appears that her symptoms only fluctuated between mild and moderate levels of functional impairment" during that time. *Id.* at 31–32. He did not explain how an extended involuntary stay in a locked hospital ward was consistent with that characterization. *See id.* Third, the ALJ relied on the years between A.T.'s 2015 hospitalization and her subsequent 2018 and 2019 hospitalization as evidence to reject Dr. Dolgoff's assertion that A.T. was generally not in remission. *Id.* at 33–34. Of those three references to this week-long involuntary psychiatric hospitalization, two (the first and third) were used to discredit other evidence of impairments, and the remaining one appeared without explanation in a section where the ALJ's conclusion is difficult—perhaps impossible—to reconcile with this incident.

In contrast, the ALJ did *not* mention A.T.'s 2015 hospitalization when he addressed the Paragraph B criterium of interacting with others, AR at 28, even though it resulted from her apparently delusional accusation that her husband was trying to kill her and her children, *id.* at 716, and led to her husband filing domestic violence charges against her, *id.* at 1232. The ALJ also did not mention this hospitalization in the context of the Paragraph B criterium of adapting or managing oneself, where its potential relevance seems obvious, *see id.* at 28–29, particularly when A.T.'s manic episode reportedly arose from stress related to her cross-country move, *see id.* at 341, 906. Nor did the ALJ address this incident in the context of Paragraph C, *id.* at 29, where it might provide evidence of "minimal capacity to adapt to changes," *see, e.g.*, Listing 12.04(C). When the ALJ expressed "sympath[y] to the claimant's continuing struggles with her mental health conditions, including her testimony that she experienced multiple manic episodes in the summers of 2018 and 2019," he concluded that those incidents did not establish relevant disability because "there is no indication her psychological conditions caused functional limitations at a disabling level prior to . . . December 31, 2017," again without reference to her 2015 manic

episode and hospitalization.  AR at 32.

The ALJ's citation of an extended involuntary hospitalization in a locked psychiatric ward primarily as evidence of *non*-disability, and his failure to address that incident in contexts where it would seem to evince more severe impairments, reflects a degree of cherry-picking that cannot survive even highly deferential review.

The ALJ's decision also includes other instances of cherry-picking, where the ALJ failed to mention evidence that did not support his conclusion.  For example, in assessing only a mild limitation in A.T.'s ability to adapt or managing herself, for example the ALJ noted A.T.'s reports "that she can dress, shave, and feed herself without difficulty," AR at 28, but did not acknowledge in that portion of his decision A.T.'s and her mother's reports that she needs reminders to bathe, wash her clothes, and take medication, even though A.T.'s report about "difficulty bathing routinely" was part of the same question where she disclaimed any problems dressing and feeding. *See* AR at 611.  The ALJ noted A.T.'s report that her mother helped her care for her son, "especially on weekends," AR at 29 (citing *id.* at 611), but did not acknowledge that by the time of the hearing, A.T. only *had* custody of her son on alternating weekends, *id.* at 349, 365.  He noted that A.T. can shop for groceries, *id.* at 29, but did not acknowledge the evidence that it takes her hours longer than most people would need to do so, *id.* at 624.  Moreover, the ALJ's decision included no reference at all to A.T.'s tearfulness, either during the administrative hearing, AR at 348, 352, or as documented repeatedly in Dr. Dolgoff's treatment notes, *e.g.*, *id.* at 1241, 1252.

This sort of seemingly motivated characterization of the evidence pervades the ALJ's decision.  The ALJ indicated repeatedly that A.T.'s having "handle[d] legal issues related to her divorce" evinced a lack of impairment, AR at 28, 32, but he cited no specific evidence of what if anything A.T. *did* to "handle" the divorce, and does not mention that it seems to have dragged out for many years and resulted in A.T. retaining extremely limited custody of her children.  Merely going through a long and contentious divorce does not in itself demonstrate any particular ability to function in a workplace.  The ALJ repeatedly cited A.T.'s ability to "spend time raising her children," *id.* at 28, 32, again without mentioning that the relevant authorities apparently did not consider her fit to retain significant custody.  The ALJ also repeatedly cited A.T.'s effort to obtain

United States District Court
Northern District of California

a social worker's license (which the ALJ described as a "degree"), *id.* at 28, 32, without noting that she had not successfully done so after more than five years trying to study for the first of two necessary tests, *see id.* at 1264 (first reference to preparing in January of 2018); *id.* at 358, 367–68 (October 2023 hearing testimony indicating that A.T. had been unable to pass the test).

In another form of cherry-picking, the ALJ declined to consider A.T.'s 2018 and 2019 hospitalizations, as well as "much of [her] hearing testimony," because they did not relate to the relevant period before A.T.'s December 31, 2017 date last insured.  AR at 32.  That alone might not be error, as courts have recognized that records postdating insurance eligibility sometimes have little if any relevance to a claimant's eligibility for benefits, though they may be relevant when they address a claimant's condition retrospectively.  *See Pavel R. v. Kijakazi*, No. CV 20-4482-JPR, 2021 WL 6752227, at *6 (C.D. Cal. Nov. 10, 2021) (discussing Ninth Circuit and district court caselaw).  When it came to evidence supporting the ALJ's finding of non-disability, however—like A.T.'s ability to pay attention during the October 2023 administrative hearing, or her efforts to seek the LCSW license first referenced in January 2018, *see id.* at 1264—the ALJ indicated no such concerns about timeliness.  *See* AR at 28, 30.

As A.T. notes in her briefs, the ALJ simply mischaracterized one piece of evidence, asserting that A.T. reported "no problems getting along with family, friends, neighbors, or others," AR at 28, when the report that he cites shows that A.T. in fact checked a box indicating the opposite, *id.* at 614.

Some of the ALJ's other justifications for his conclusion are also not supported by substantial evidence.  The ALJ cited A.T.'s single apparently successful vacation in July of 2017[10] five times as evidence of non-disability, including to rebut Dr. Dolgoff's assessment of an extreme limitation in going unfamiliar places.  AR at 28, 32, 33.[11]  Dr. Dolgoff's note regarding the vacation, however, does not mention where (if anywhere) A.T. went, whether it was unfamiliar to her, or what if any support or help she had.  *Id.* at 1256.  It is not even clear that A.T. herself was

---

[10] The ALJ characterized it as occurring in August, but Dr. Dolgoff's treatment note from August 1, 2017 indicated that the week of vacation had recently ended.  AR at 1256.
[11] Pages 28 and 32 each include two separate invocations of A.T.'s vacation.

*on* vacation or went anywhere. Dr. Dolgoff's note reads only, "Doing well—had an entire week with children on vacation, a little let down after return." *Id.* That could just as easily mean that A.T. had a week of custody while her children were on summer vacation from school, and she was "let down" after returning them to her husband. The ALJ identified no other evidence related to the vacation, and he did not ask A.T. about it at the administrative hearing. "The ALJ always has a special duty to fully and fairly develop the record and to assure that the claimant's interests are considered even when the claimant is represented by counsel." *Celaya v. Halter*, 332 F.3d 1177 (9th Cir. 2003). Before relying on a single ambiguous treatment note as indicating that A.T. was capable of traveling with her children, the ALJ should have inquired further as to its meaning and circumstances. Similarly, A.T.'s testimony that she studied "maybe three times a week" for the LCSW test "for like a couple of hours" does not, without further elaboration, demonstrate that she was able to maintain continuous concentration and focus for those full "couple of hours" sessions. *See* AR at 357–58.

The ALJ's selective or unsupported use of evidence affected his analysis of whether A.T. met or equaled a listing at Step 3 as well as his analysis of her RFC before proceeding to Steps 4 and 5, including the degree to which the ALJ credited A.T.'s testimony and Dr. Dolgoff's opinoins. Remand is necessary to allow for a more complete and supported analysis.

### B.    The ALJ Erred in Considering the Paragraph C Criteria

The Paragraph C criteria for the listings at issue, which can serve as a substitute for the Paragraph B criteria, require a claimant to show a lasting diagnosis (which is not reasonably subject to dispute here), a course of treatment that mitigates the claimant's symptoms, and "marginal adjustment":

> C. Your mental disorder in this listing category is "serious and persistent;" that is, you have a medically documented history of the existence of the disorder over a period of at least 2 years, and there is evidence of both:
>
> 1. Medical treatment, mental health therapy, psychosocial support(s), or a highly structured setting(s) that is ongoing and that diminishes the symptoms and signs of your mental disorder (see 12.00G2b); and
>
> 2. Marginal adjustment, that is, you have minimal capacity to adapt to changes in your environment or to demands that are not already

part of your daily life (see 12.00G2c).

*E.g.*, Listing 12.04(C).

The ALJ accurately summarized those requirements in reciting the standard, but altered them when he turned to applying them to A.T.'s case. AR at 29. Instead of considering "[m]edical treatment, mental health therapy, psychosocial support(s), *or* a highly structured setting(s)," *see* Listing 12.04(C), the ALJ only addressed the final item in that list, writing: "In this case, the claimant is not in a highly structured setting that is designed to, or intended to, diminish the symptoms and signs of her mental disorder." *Id.* at 29.

The Commissioner does not address or defend that portion of the ALJ's decision in his brief, instead focusing only on the "marginal adjustment" prong of the test. ECF No. 13 at 7–8. The record includes evidence that A.T. participated in ongoing "[m]edical treatment" and "mental health therapy" that diminished her symptoms. The ALJ's failure to consider such treatment in the context of Paragraph C was legal error.

As for "marginal adjustment," the listings provide the following guidance:

> The criterion in C2 is satisfied when the evidence shows that, despite your diminished symptoms and signs, you have achieved only marginal adjustment. "Marginal adjustment" means that your adaptation to the requirements of daily life is fragile; that is, you have minimal capacity to adapt to changes in your environment or to demands that are not already part of your daily life. We will consider that you have achieved only marginal adjustment when the evidence shows that changes or increased demands have led to exacerbation of your symptoms and signs and to deterioration in your functioning; for example, you have become unable to function outside of your home or a more restrictive setting, without substantial psychosocial supports (see 12.00D). Such deterioration may have necessitated a significant change in medication or other treatment. Similarly, because of the nature of your mental disorder, evidence may document episodes of deterioration that have required you to be hospitalized or absent from work, making it difficult for you to sustain work activity over time.

Listing 12.00(G)(2)(c).

Here, the ALJ asserted without explanation that "there is no evidence of only marginal adjustment," and that "the claimant is able to take care of his [sic] activities of daily living." AR at 29. Even setting aside the question of whether A.T. was actually able to "take care" of such activities, the ALJ did not explain how that relates the test for marginal adjustment. The

28

Commissioner's brief cites the example of someone who is "unable to function outside of [their] home or a more restrictive setting," suggesting that was not the case for A.T., but does not address any other examples. *See* ECF No. 13 at 8–9.

One of the other examples of "minimal adjustment" set forth in the listings is "evidence [of] episodes of deterioration that have required [a claimant] to be hospitalized . . . , making it difficult for [them] to sustain work activity over time." Listing 12.00(G)(2)(c). Here, A.T. had one such episode during the period before her date last insured (the 2015 hospitalization) and three more in the years following her date last insured. The 2015 hospitalization appears to have been caused by "changes in [her] environment or . . . demands that [were] not already part of [her] daily life," *see id.*, in the form of her move from New York to California, *see* AR at 341, 906. Neither the ALJ's decision nor the Commissioner's brief offers any justification for the ALJ's failure to address A.T.'s hospitalizations—or at least her 2015 hospitalization—in his analysis of marginal adjustment.

The ALJ's failure to analyze the Paragraph C criteria properly is therefore another error requiring remand.

### C.    The ALJ Erred in Evaluating A.T.'s Testimony

The Ninth Circuit has "established a two-step analysis for determining the extent to which a claimant's symptom testimony must be credited." *Trevizo v. Berryhill*, 871 F.3d 664, 678 (9th Cir. 2017). "First, the ALJ must determine whether the claimant has presented objective medical evidence of an underlying impairment which could reasonably be expected to produce the pain or other symptoms alleged." *Id.* (quoting *Garrison*, 759 F.3d at 1014–15). If the claimant meets this requirement and there is no evidence of malingering, "the ALJ can reject the claimant's testimony about the severity of her symptoms only by offering specific, clear and convincing reasons for doing so. This is not an easy requirement to meet: The clear and convincing standard is the most demanding required in Social Security cases." *Id.* To satisfy the "clear and convincing reasons" requirement, "[g]eneral findings are insufficient; rather, the ALJ must identify what testimony is not credible and what evidence undermines the claimant's complaints." *Brown-Hunter v. Colvin*, 806 F.3d 487, 493 (9th Cir. 2015) (quoting *Reddick v. Chater*, 157 F.3d 715, 722 (9th Cir. 1998)).

29

United States District Court
Northern District of California

In weighing the claimant's credibility, the ALJ may consider many factors, including "(1) ordinary techniques of credibility evaluation, such as the claimant's reputation for lying, prior inconsistent statements concerning the symptoms, and other testimony by the claimant that appears less than candid; (2) unexplained or inadequately explained failure to seek treatment or to follow a prescribed course of treatment; and (3) the claimant's daily activities." *Tommasetti v. Astrue*, 533 F.3d 1035, 1039 (9th Cir. 2008) (quoting *Smolen v. Chater*, 80 F.3d 1273, 1284 (9th Cir. 1996)). The ALJ's reasons must be supported by substantial evidence in the record. *Thomas v. Barnhart*, 278 F.3d 947, 959 (9th Cir. 2002).

Here, the ALJ found "that the claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms," AR at 30, and he did not find that she was malingering. The ALJ was therefore required to provide clear and convincing[12] reasons to reject specific portions of her testimony.

Instead, the ALJ asserted generically that "the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record for the reasons explained in this decision," and that her "statements about the intensity, persistence, and limiting effects of her symptoms . . . are inconsistent because the clinical and objective findings contained in the medical evidence prior to the claimant's date last insured . . . are inconsistent with the claimant's allegations of disabling psychological conditions." AR at 30. Those statements do not "identify what testimony is not credible and what evidence undermines the claimant's complaints," much less by providing convincing reasons for the ALJ's conclusions. *Brown-Hunter*, 806 F.3d at 493.

The next paragraph of the ALJ's decision begins more promisingly, with the word "Specifically." AR at 31. Instead of providing specific reasons to reject specific testimony, however, the ALJ went on merely to summarize over several paragraphs some of A.T.'s treatment records from August 13, 2015 through January 3, 2018. *Id.* at 31–32. The ALJ then asserted that

---

[12] The Court notes the Commissioner's longstanding objection to the Ninth Circuit's "clear and convincing" standard in this context. ECF No. 13 at 8 n.2. As the Commissioner acknowledges, however, this Court is bound by Ninth Circuit precedent.

A.T.'s "symptoms only fluctuated between mild and moderate levels of functional impairment" (apparently setting aside the 2015 hospitalization that the ALJ included four paragraphs earlier in his summary), listed some of the same activities addressed above like A.T. having "handle[d] legal issues related to her divorce," and rejected the subsequent hospitalizations and "much of the claimant's hearing testimony" as only relevant beyond her date last insured. *Id.* at 32. The ALJ then turned to his evaluation of medical opinion evidence, without ever identifying which portions of A.T.'s testimony he found not credible. *See id.*

Particularly in conjunction with the concerns addressed above regarding the ALJ's selective treatment of the record, the ALJ's "[g]eneral findings" regarding A.T.'s testimony "are insufficient" to permit review consistent with Ninth Circuit precedent, *see Brown-Hunter*, 806 F.3d at 493, and that deficiency warrants remand. *See Burrell v. Colvin*, 775 F.3d 1133, 1138 (9th Cir. 2014) (reversing where "the ALJ did not elaborate on *which* daily activities conflicted with *which* part of Claimant's testimony").

### D.     Remand for Further Proceedings Is Necessary

"When the ALJ denied benefits and the court finds error, the court ordinarily must remand to the agency for further proceedings before directing an award of benefits." *Leon v. Berryhill*, 880 F.3d 1041, 1045 (9th Cir. 2017). The Ninth Circuit recognizes a narrow exception for certain cases where the Commissioner improperly found a claimant or doctor's opinions not credible. That "credit-as-true" rule applies only when the following three elements are established:

> (1) the record has been fully developed and further administrative proceedings would serve no useful purpose; (2) the ALJ has failed to provide legally sufficient reasons for rejecting evidence, whether claimant testimony or medical opinion; and (3) if the improperly discredited evidence were credited as true, the ALJ would be required to find the claimant disabled on remand

*Garrison*, 759 F.3d at 1020 (emphasis added).

"When all three elements of this . . . rule are satisfied, a case raises the 'rare circumstances' that allow [a court] to exercise [its] discretion to depart from the ordinary remand rule." *Treichler v. Comm'r of Soc. Sec. Admin.*, 775 F.3d 1090, 1101 (9th Cir. 2014). Courts may apply the credit-as-true rule only if crediting a claimant's testimony or a medical opinion would "leave not the

31

United States District Court
Northern District of California

slightest uncertainty as to the outcome of the proceedings." *See id.* 1100–01.

Here, A.T. asserts that a judicial award of benefits is appropriate because "[t]here is no serious doubt that [her] mental impairments would not have allowed her to sustain competitive full-time employment since her alleged onset date in May 2015." ECF No. 9 at 29. She does not, however, identify any of her own testimony that would compel such a finding if credited, either under a listing at Step 3 or by precluding any significant amount of work available at Step 5.

A.T. asserts that Dr. Dolgoff's opinions regarding marked and extreme limitations would support finding her "disabled at step three as her symptoms and condition met Listing 12.04." ECF No. 10 at 28–29; ECF No. 14 at 9. But she does not explain why that is so. A.T. has not identified opinions from Dr. Dolgoff (or any other evidence) directed to Paragraph A of Listing 12.04, which is required *in addition* to either Paragraph B or Paragraph C. That deficiency alone is enough to conclude that A.T. has not met her burden to award benefits under the credit-as-true rule.

With respect to Paragraph B, even though Dr. Dolgoff found a number of marked and extreme restrictions on certain abilities within the four broad functional categories at issue, he did not offer an opinion on any of those categories more generally. AR at 1343–45. A.T. has not addressed whether, for example, a marked limitation in a claimant's ability to "[u]nderstand and respond to social cues" equates to a marked limitation in the broader category of interacting with others, even if the claimant has no limitations when it comes to some of the other components of that category like "[a]sk[ing] simple questions or request[ing] assistance." *See id.* at 1344. Further, Dr. Dolgoff rendered these opinions in 2023, *id.* at 1347, and he did not specifically address whether they applied retrospectively to A.T.'s condition in the relevant period from 2015 through 2017. Dr. Dolgoff's subsequent letter asserting that A.T. "suffered from marked limitations with respect to work virtually continuously throughout the time that [he has] been her psychiatrist" does not specify what those marked limitations are, and whether they encompass all of the limitations addressed in his earlier report. *See id.* at 1401.

As for Paragraph C, even though there is other evidence in the record that might support a finding of disability under those criteria, A.T. has not identified any portion of Dr. Dolgoff's

testimony that would compel such a conclusion if credited as true.

To the extent A.T. might rely on Dr. Dolgoff's note that she "can't work at all," AR at 1346, that opinion goes "to the ultimate issue of disability, which is a question 'reserved to the Commissioner.'" *See, e.g.*, *Turner v. Kijakazi*, No. 21-15462, 2022 WL 1537358, at *1 (9th Cir. May 16, 2022) (citing 20 C.F.R. § 404.1527(d)).

A.T. therefore has not established "rare circumstances" that justify "depart[ing] from the ordinary remand rule" to award benefits under the credit-as-true doctrine. *See Treichler*, 775 F.3d at 1101. Applying the ordinary rule, the Court remands the case for further administrative proceedings.

## V.    CONCLUSION

For the reasons discussed above, the decision of the Commissioner finding A.T. not disabled and denying her application for supplemental security income is REVERSED, and the case is REMANDED for further administrative proceedings consistent with this Order. The Clerk shall enter judgment in favor of A.T. and close the case.

**IT IS SO ORDERED.**

Dated: March 31, 2026

LISA J. CISNEROS
United States Magistrate Judge

United States District Court
Northern District of California

33